## Commonwealth *v.* John Gibbons, Appellant.

*Jurisdiction, Superior Court—Contempt of court in proceedings in con-tested election.*

The Superior Court has exclusive and final appellate jurisdiction of all proceedings of any kind in the court of quarter sessions, and hence its jurisdiction attaches where the record shows a proceeding against a defendant for a contempt of court, consisting of a refusal to testify in a case involving the right to a public office. Such proceeding or the judgment therein does not involve the right to the office in question nor can such right be in any manner affected by the determination of the question presented in the contempt proceeding, which is in itself a distinct and substantive offense against the law.

*Jurisdiction, Superior Court—Common law—Habeas corpus.*

Common-law principles underlie all forms of procedure and enter very largely into the adjudications of the Superior Court both directly and by implication ; and that court, or any judge thereof in vacation, has the power to grant a common-law writ of habeas corpus, whenever necessary in aid of pending appeals. This right, moreover, is conferred expressly by the Act of June 24, 1895, P. L. 212.

*Habeas corpus—Common-law power to issue writ.*

The power to grant a writ of habeas corpus is an implied common-law power, not created by the habeas corpus act of 1785, but existing both before and since the passage of that act, in every court of record invested with extensive appellate jurisdiction, whether applied for in term time or vacation, and the writ may be moulded to meet the exigencies of the particular case.

*Appeals—Practice, Superior Court—Habeas corpus—Certiorari.*

Certiorari and habeas corpus may be severally used as ancillary to each other and when so used the duty of the appellate court in a contempt case is to ascertain whether the court below had jurisdiction in the premises, and exercised it according to law ; whether the offense of which the relator stands convicted was one which the court had power to punish summarily and whether the sentence was lawfully imposed. These questions are to be determined by the record brought up with the certiorari.

*Election law—Contempt of court—Refusal to answer questions—Habeas corpus.*

A witness who refuses to answer questions propounded in a contested election case, and who is thereupon sentenced by the court of quarter sessions for contempt is not unjustly deprived of his liberty and will not be released on habeas corpus by the Superior Court.

Argued Jan. 16, 1899.   Appeal, No. 1, Jan. T., 1900, by defendant, from sentence of Q. S. Lackawanna Co., Dec. Sess.,

1898, No. 380, in proceedings in contempt of court against John Gibbons. Before RICE, P. J., BEAVER, ORLADY, SMITH, W. W. PORTER, W. D. PORTER and BEEBER, JJ.   Affirmed.

Proceedings in contempt of court.   Before ARCHBALD, P. J.

It appears from the record that John Gibbons was summoned before examiners appointed to take testimony in the contested election case of M. J. Kelly for the office of county treasurer of Lackawanna.

He was asked sundry questions tending to elicit information as to whether he had been bribed or had bribed any one at the election of November, 1897, the object being to disqualify and throw out his vote under the provisions of sec. 8, art. 8 of the constitution.   To this he made a general answer, denying that he had done of those things forbidden by said constitutional provisions, but refusing to give details and particulars in regard to money he had expended in matters concerning said election, and claiming the protection of the provisions of the bill of rights and of the constitution of the United States against giving evidence against himself.   The questions and answers and refusals to answer were certified by the examiners to the court, and the court ruled that he should answer in full.   On his refusal to do this, an attachment for contempt was issued and judgment entered against him, and he was committed to jail till he should purge himself of contempt by answering the questions.   A writ of habeas corpus was directed to issue from this court by Judge SMITH, and upon hearing thereon the defendant was admitted to bail pending the judgment of this court on a certiorari to the court below.

The court below delivered the following sentence:

[Now, December 20, 1898, the sentence of the court is that you, John Gibbons, pay the costs of these proceedings, that you purge yourself of the contempt in which you stand by answering the questions which you have been directed to answer, and you are hereby committed to the county jail of Lackawanna county to be there confined until you shall answer the questions which you have been ordered to answer, and thereby purge yourself of the contempt.] [2]

John Gibbons appealed.

. *Errors assigned* were (1) in not quashing writ of attachment. (2) In entering judgment on the attachment and sentencing defendant, John Gibbons, to imprisonment in the county jail, reciting judgment and sentence. (3) In sentencing defendant to imprisonment for a contempt not committed in open court.

*I. H. Burns* and *H. W. Palmer*, for appellant.—The appellant seeks to maintain three propositions :

1. The vote of appellant having been accepted by the election board, it is a valid vote under the provisions of section 8, article 8, of the constitution, and cannot be excluded from the count. The questions asked were, therefore, irrelevant and immaterial, the court having no jurisdiction over the question sought to be raised.

2. No contempt was committed in open court, and there was, therefore, no authority to imprison.

3. The appellant is protected by the bill of rights of the constitution of Pennsylvania and by the constitution of the United States.

Section 8 of article 8 is not a disqualification but a penalty.

Again, if this penalty imposed upon the voter be a penalty then our bill of rights, our constitution and our laws all agree that the party accused must have an opportunity to defend. If the decision of the court below be good law, where is the opportunity for defense ?

We are not unaware of the decision in In re Contested Election of Harry White, 4 Dist. Rep. 363, but in that case the points here raised seem not to have been fully considered, and the decision itself is a good example of the necessity for a Superior Court for the correction of errors.

The commitment of the defendant is illegal, for the reason that it is a sentence to imprisonment for a contempt not committed in open court.

*R. H. Holgate* and *J. J. H. Hamilton*, for appellee, declined to furnish paper-books for reporter, libraries and prothonotary.

OPINION BY SMITH, J., February 17, 1899 :

The defendant was sworn as a witness before examiners appointed under the Act of May 19, 1874, P. L. 208, to take and

report the testimony in an election contest. He refused to answer fully certain questions touching the receipt or use of money by him at the election in question. The examiners certified this matter to the court, and the court, after notice to the defendant, directed him to appear before the examiners and answer the questions. Subsequently he appeared as directed and again refused to answer, except in an unresponsive and indefinite manner; whereupon the court granted a rule directing him to show cause why he should not answer fully as required. The defendant appeared, in answer to this rule, and submitted a written reply, denying that he had violated the eighth section of the constitution of Pennsylvania, and admitting that he had paid certain moneys at the election in contest, within the meaning of the Act of April 18, 1874, P. L. 64, but without specification in any particular. His answer on these points was but a repetition of the section of the constitution and the statute referred to, and in the same general terms. He expressly declined to give specific answers as to details, " for the reason that such answers might tend to criminate him, and would compel him to give evidence against himself as to persons and circumstances that might be used against him in the prosecution. And upon this he claimed the protection of the bill of rights of the constitution of Pennsylvania and the provisions of the constitution of the United States." With this answer before the court, in effect a challenge of its right to enforce its order requiring him to answer the questions propounded, a rule on the defendant was granted to show cause why he should not be committed for contempt. After argument, this rule was made absolute and the defendant was sentenced to imprisonment in the county jail until he purge himself of the contempt. From this judgment an appeal was taken, and, on application, a writ of habeas corpus was allowed by one member of this court, thereby suspending the operation of the sentence until the validity of the commitment could be reviewed. This writ was allowed in vacation and made returnable on the first day of our session next following.

Our jurisdiction in the premises is questioned by the appellee, on the grounds : (*a*) That the proceeding arises in a case involving the right to a public office, while the statute creating this court excepts from its powers that of reviewing such a

case; (*b*) that this court has no common-law power, and can exercise such powers only as are given it by statute; (*c*) that under the Act of June 24, 1895, P. L. 212, the court alone can issue writs of habeas corpus, and a single judge has no authority to issue this writ in vacation.

On none of these grounds can the objection to our jurisdiction be sustained. This court has exclusive and final appellate jurisdiction of "all proceedings of any kind in the court of quarter sessions, or before any judge thereof, except cases involving the right to a public office." The record before us shows a proceeding against the defendant for a contempt of court, consisting of a refusal to testify in a case involving the right to a public office. But in no aspect does this proceeding, or the judgment of the court below in this case, involve the right to the office in contest, nor can such right be in any manner affected by our determination of the questions here presented. In character and effect, the proceeding is wholly independent of the cause in which it had its origin. In its review we have no right to inquire into the effect or materialty of the evidence offered in the contest or the questions which the defendant refused to answer. It has been said by our Supreme Court that contempt of court is a distinct and substantive offense against the law: Williamson's Case, 26 Pa. 9. In this case, BLACK, J., in delivering the opinion of the court, said: "It must be remembered that contempt of court is a specific criminal offense. It is punished sometimes by indictment, and sometimes in a summary proceeding, as it was in this case. In either mode of trial, the adjudication against the offender is a conviction, and the commitment in consequence is execution: Karney's Case, 7 Wheat. 38. This is well settled, and I believe has never been doubted. Certainly the learned counsel for the petitioner have not denied it. The contempt may be connected with some particular cause, or it may consist in misbehavior, which has a tendency to obstruct the administration of justice generally. When it is committed in a pending cause, the proceeding to punish it is a proceeding by itself. It is not entitled in the cause pending, but on the criminal side: U. S. v. Wayne, Wall. (U. S. C. C.) 134. The record of a conviction for contempt is as distinct from the matter under investigation, when it was committed, as an indictment for perjury is from the cause in which

the false oath was taken.   Can a person, convicted of perjury, ask us to deliver him from the penitentiary, on showing that the oath, on which the perjury is assigned, was taken in a cause of which the court had no jurisdiction?   Would any judge in the commonwealth listen to such a reason for treating the sentence as void?   If, instead of swearing falsely, he refuses to be sworn at all, and he is convicted not of perjury, but of contempt, the same rule applies, and with a force precisely equal. . . . . I will content myself by simply referring to some of the books in which it is established that the conviction of contempt is a separate proceeding, and is conclusive of every fact which might have been urged on the trial for contempt, and among others want of jurisdiction to try the cause in which the contempt was committed: Yates's Case, 4 Johns. R. 317, 325, et seq.; the opinion of Chief Justice KENT on pages 370 to 375; Yates v. People, 6 Johns. 337, 503; Yates v. Lansing, 9 Johns. 395, 423; People v. Nevins, 1 Hill, 154, 170; State v. Woodfin, 5 Iredell, 199; In re Summers, 5 Iredell, 149, 153; Smithurst's Case, 2 Sandf. 724; Sherry v. Wintor, 1 Carter, 96; State v. Tipton, 1 Blackf. 166; Adams's Case, 25 Miss. 883; Com. v. Deacon, 2 Wheeler's Criminal Cases, 1; Dimes's Case, 14 Ad. & Ellis, 554." It may be also noticed that this proceeding is not entitled in the contested election case, but takes a separate title and number on the criminal side of the quarter sessions.

The broad proposition that this court "has no common-law power," is indeed novel, and in striking contrast with the practice of the court since its organization.   This contention overlooks the nature and extent of the common law, and how broadly it permeates all American jurisprudence.   The common law of England is the basis of our jurisprudence, and its great principles are the foundation of the federal and state constitutions and state legislation.   Each state has its common law, derived mainly from the common source, and without this its jurisprudence would be little more than a constitutional and statutory skeleton, largely deficient in material substance and life.   Nearly all our legal principles, rules and forms, are of common-law origin.   Common-law principles underlie all forms of action, and regulate all forms of procedure.   Undeniably, common-law powers are indispensable to an adequate exercise of the ordained functions of this court.   The power of a court is exercised

through its decrees and their enforcement, and when its decrees are founded on the common law their enforcement proceeds in the course of the common law. The principles, rules and forms of the common law enter very largely into the adjudications of this court, both directly and by implication.

It is further contended that although this court may issue the writ of habeas corpus, by virtue of the act of June 24, 1895, one of its judges cannot do so in vacation. This question arose soon after the organization of this court, in Duff v. McDonough, 2 Pa. Superior Ct. 373. In that case our late Brother WICK-HAM issued the writ in vacation and made it returnable to the next term. While the question received consideration, no official announcement was necessary in view of the disposition made of the case on other controlling grounds. Subsequently, in Com. ex rel. Robert E. Tryford v. Harry A. Lowry, sheriff of Allegheny county et al., a case still pending in this court, a writ of habeas corpus was issued, also by our late Brother WICK-HAM, in vacation, and upon the question of his authority to do this he wrote an opinion in which he said: " The inherent power of the Superior Court, or of any judge thereof in vacation, to grant a common-law writ of habeas corpus, whenever necessary, in aid of a pending appeal, is, and should be, beyond controversy, even if the right were not expressly conferred, as it is, by the Act of June 24, 1895, P. L. 212, erecting the court. It is an implied common-law power, not created by the habeas corpus act of February 18, 1785, 2 Sm. L. 275, sec. 13, but existing both before and since the passage of that act, in every court of record, invested with extensive appellate or supervisory jurisdiction ; and, in a proper case, it is always grantable, whether applied for in term time or in vacation. It may be moulded to suit the exigencies of the particular case: Gosline v. Place, 32 Pa. 520; Williamson v. Lewis, 39 Pa. 9; Duff v. McDonough, 2 Pa. Superior Ct. 373." This action of a single judge was afterward sustained by the court in banc. In resting the authority of a judge to issue the writ on the implied common-law power, Judge WICKHAM repeated an established principle and followed the precedents given by our Supreme Court and the courts of England.

The judges of the King's Bench and common pleas of England found a similar lack of express authority in the British

statute, but in order to carry out its manifest purpose and spirit they extended the powers, impliedly given to the courts, to a single member of those tribunals when the courts were not in session. On this point the Lord Chancellor, in Crowley's case, 2 Swanston's Chancery Reports, 1, 42, said : " The statute gives no jurisdiction to the judges of the common pleas to issue a writ of habeas corpus, except in cases there mentioned ; but then, by a construction in favor of the liberty of the subject, they have granted the writ in other cases, and have inferred from the statute giving to them power in specified instances, that they possess a general power to issue the writ." In this case Lord ELDON overruled the decision in Jenks's case, and vindicated, on principle and precedent, the power of a single judge to issue the writ in vacation, notwithstanding the want of express statutory authority.

The statutory writ of habeas corpus in Pennsylvania is of limited application. The cases to which it extends are of two classes only : public restraints, on bailable criminal charges, and private restraints on any pretense whatsoever. But the efficacy of the common-law writ of habeas corpus reaches much farther, and takes many forms, according to the character of the case in which it is applied. The authority, given to this court, in the provision that " it may issue writs of habeas corpus," without limitation or restriction, from its nature embraces all writs of habeas corpus known to the law, whether common law or statutory. Without extending the discussion by reviewing the history and distinctive character of the several common-law writs of habeas corpus, it is sufficient to say that the writ in the present case is a common-law writ, and was not issued in pursuance of the habeas corpus act, but by virtue of the inherent common-law power vested in the Superior Court. " It is a form of remedy which can be administered only by a court in banc, though a single judge may allow the writ, on sufficient cause : " LOW-RIE, C. J., in Gosline v. Place, 32 Pa. 520. " It has a much broader scope than that form of it which is secured by the habeas corpus act ; for it may issue in all sorts of cases where it is shown to the court that there is probable cause for believing that a person is restrained of his liberty unlawfully or against the due course of law. The statutory remedy falls far short of this and we fall into inevitable confusion when we go into the

common-law province of the writ for the principles that are to rule within its statutory province : " Williamson v. Lewis, 39 Pa. 9. It was also held by the Supreme Court in that case that the writ of habeas corpus authorized by the act of 1785 could not be employed in cases of conviction for contempt of court. In those cases the common-law writ is the proper remedy.

It is an established principle of construction that " the power to render judgment involves in it the power to take the preliminary steps which lead to that result : " Com. v. Simpson, 2 Grant, 438. It is to be presumed, therefore, that in giving this court exclusive appellate jurisdiction of cases involving the liberty of the citizen, and to render final judgment therein, it was, ex necessitate rei, intended to confer the power necessary to give adequate effect to such appeals. In granting this power the legislature is to be understood as having in view the existing law, both common and statute : and in employing terms broad enough to embrace all lawful writs of habeas corpus, the legislature is presumed to have meant all such writs, under the common law and the statute of 1785. For a like construction of a generic term see Com. v. Bell, 145 Pa. 374. The validity of a sentence to imprisonment depends on the jurisdiction of the tribunal, and the regularity of the proceedings in which it is pronounced, and relief can be given only by a court having power to review and determine the question of jurisdiction or of regularity. This power, in the case in hand, is by the act of June 24, 1895, vested solely in this court. Its exercise is made effectual, by way of remedy, through the writ of habeas corpus, as ancillary to the writ of certiorari.

It has long been settled that certiorari and habeas corpus may be severally used as ancillary to each other. " If a habeas corpus at common-law issues, and the return to it shows that the prisoner is held by virtue of proceedings in a court, or before a magistrate, over which the court issuing the habeas corpus has a supervisory authority, the said court may issue a certiorari to bring up the record ; and may thereupon hear and decide the case, or review and correct the proceedings, in order to give efficacy to the writ of habeas corpus. If a certiorari be issued to bring up a case into a higher court for hearing or review, the court may also issue a habeas corpus to bring up the defendant ; and may, in a proper case, admit him to bail to appear at

the hearing and abide the event; and the form of the recognizance must be adapted to the exigencies of the case. Old forms will not entirely suit new classes of cases, but must be moulded to suit them: " Gosline v. Place, 32 Pa. 520. If the writ may not be issued by a judge of this court, preliminary to a review of the proceeding by the court, the petitioner must suffer imprisonment, perhaps for months, until the meeting of the court; a result inconsistent with the right to a speedy determination of the legality of his imprisonment, which it is the purpose both of the appeal and the writ of habeas corpus to secure. The allowance of the writ in vacation is in conformity with the practice in the Supreme Court, as illustrated in Gosline v. Place, and Com. v. Bell, supra. Section 8 of the act of June 24, 1895, requires this court to "be governed by the rules which do now or may hereafter govern the practice in the Supreme Court." By section 12 of the Act of May 19, 1897, P. L. 67, an appeal from a sentence is to operate as a supersedeas when so ordered by the court below, or the appellate court or any judge thereof; and, the appeal having been duly taken in the present case, the allowance of the writ of habeas corpus may be regarded as, in effect, an order of supersedeas. The allowance of the writ does not imply error in the proceeding. It is a recognition, resting on the appellate court as a judicial duty, of the appellant's right to a review of the proceedings, and to a determination of the questions which his assignment of errors may raise, and meantime to be relieved, on such conditions as may properly be imposed, from the imprisonment which he avers to be unlawful. He is not to be deprived of this right by a construction of the judicial power based on technical narrowness rather than substantial justice. We are unanimously of opinion that the writ of habeas corpus was properly issued in this case, and that the proceeding is regularly before us for review.

The scope of our power of review, in this class of cases, is defined by judicial decision. In the present case it is only nec essary to indicate the limitations thus marked out. Adherence to this well-defined line of inquiry shows that many of the questions discussed on the argument and pressed for consideration are beyond the legitimate range of our investigation. We are to ascertain whether the court below had jurisdiction in the premises, and exercised it according to law; whether the of-

fense of which the relator stands convicted was one which the court had power to punish summarily, and whether the sentence was lawfully imposed. These questions are to be determined by the record brought up with the certiorari. No exception is taken to the form or sufficiency of the commitment or the sheriff's return to the writ of habeas corpus. Any technical defect therein would seem to be supplied by the petition for the writ of habeas corpus, and we will therefore treat the commitment and the sheriff's return as sufficient, in view of the whole record.

The power to punish contempts of court is so well settled, by repeated adjudication, that it is unnecessary to rehearse the reasons given in support of this authority, or to cite the cases in which it is established. The practical question here is : Does the offense for which the relator was convicted constitute a contempt of court within the meaning of the law, for which summary punishment may be imposed? The argument that the disqualification under article 8, section 8, of the constitution, is not a disqualification in the legal sense, but a penalty, and applies only to the proof required of the voter before his ballot can be accepted by the election board, and cannot be inquired into thereafter, is radically unsound, and conflicts with other sections of equal force relating to elections. Under the construction contended for, this provision of the constitution, manifestly designed to prevent fraud at elections, would become a shield, and a ratification of fraud because of its successful perpetration. Such a construction is not to be tolerated.

That the refusal by a witness to answer questions material to the issue of the case in which he is called, is a contempt of court, and punishable as such, is not and cannot be denied, as a general proposition. But it is set up in defense that the questions here propounded are excepted from the general rule, on the ground that the answers would tend to self-crimination ; that the constitution provides that no person shall be compelled to give evidence against himself, and, as the relator has formally claimed the benefit of this clause, he cannot be compelled to answer, or be punished for his refusal. The answer to this objection is found in the constitution itself. By article 8, section 10, it is provided that, " In trials of contested elections, and in proceedings for the investigation of elections, no person shall be per-

mitted to withhold his testimony, upon the ground that it may criminate himself, or subject him to public infamy; but such testimony shall not afterwards be used against him, in any judicial proceeding, except for perjury in giving such testimony." To this it is replied that this provision is itself unconstitutional, because it is in conflict with the bill of rights which " is excepted out of the general powers of government, and shall forever remain inviolate." This question involves largely the sufficiency of the cause of conviction, and it may be doubtful whether we are required to rule upon it. But if the relator is being prosecuted for a matter which is not an indictable offense under the law of Pennsylvania, it would be our right as well as our plain duty to examine the subject, and to discharge the relator if this be true: Com. v. Ketner, 92 Pa. 372.

The question calls for the interpretation of the constitution, on this alleged conflict of the terms of that instrument. " The constitution is entitled, like other instruments, to a construction, as nearly as may be, in accordance with the intent of its makers:" Moers v. Reading, 21 Pa. 188. " A constitution is not to receive a technical construction, like a common-law instrument or a statute. It is to be interpreted so as to carry out the great principles of the government, not to defeat them:" Com. v. Clark, 7 W. & S. 127. It should be construed in the light which the whole instrument throws upon it. The elective principle is, essentially, a vital force in our form of government and in the organic law. As the state develops and expands, the principle of the elective system grows in public importance and methods of execution. The progressive measures adopted from time to time, by constitution and statute, for the perpetuation and preservation of this principle, illustrate its paramount importance in governmental affairs. We may safely conclude, therefore, that the elective principle is one of " the great principles of the government" which it is the aim of the constitution to preserve, and all laws, constitutional and statute, relating to elections, should be construed to that end. The constitutional provision in question must be interpreted in the light which the whole instrument throws upon it, and the purpose and intent of the people in its adoption. Its manifest purpose was to protect the purity of the ballot box, and to this end it was deemed nec

essary to adopt constitutional measures, regulating the right of franchise.  "A fraud upon the ballot box is a crime against the nation : " Com. v. Walter, 83 Pa. 105.  It is most necessary, therefore, to enforce all existing measures for the repression of this offense.

It is quite clear that those constitutional measures may be enforced without violating the bill of rights, which is to be construed in harmony with the other parts of the constitution, and thus full effect given to every section of that instrument.  The essential purpose of the clause of the bill of rights referred to, was to prevent the compulsory self-inculpation of those charged with crimes against the law.  Any subordinate provision of law violative of that purpose must be declared null and void.  Without conceding that the 10th section of article 8 of the constitution is subordinate to the bill of rights, it is certain that this section may be sustained without conflicting with the purpose and effect of that clause.  By section 9 of the bill of rights, " In criminal prosecutions, the accused cannot be compelled to give evidence against himself."  But in cases within article 8, section 10, the witness who testifies to his own turpitude does not give evidence against himself, since the testimony thus given cannot be used as evidence against him in any judicial proceeding, except for perjury in giving it.  Thus the very purpose of the bill of rights is preserved and absolutely secured in spirit and effect.  To hold otherwise, and annul the 10th section of article 8, would deprive the people of a very important constitutional provision.  It would open the doors to corrupt and fraudulent voting, against the plain intent of the law.  The case of Com. v. Bell, supra, relied upon by the appellee, throws no light on this question.  We think, however, that our conclusion is correct in principle and on governmental policy.

There is nothing in the federal constitution, as construed by the courts, in conflict with this conclusion.  The fifth amendment, relied upon in the argument, is, like the other amendments, a restriction upon federal power, and does not extend to the states : Livingston v. Moore, 7 Pet. 469, 551.  Subsequent cases are to the same effect.  The case of Counselman v. Hitchcock, 142 U. S. 547, arose under a federal statute,—an act to regulate commerce, in a federal court.  It cannot apply here, and is entirely consistent with the principle of the preceding cases.

The remaining questions call for but brief notice. It is contended that the offense was not committed in open court but before the examiners, who had full power to commit for refusal to answer, under the Act of February 26, 1831, P. L. 92, and, therefore, the sentence of the court is illegal. We cannot adopt this view. The answer of the relator to the rule issued by the court was presented and read in open court by his counsel and in his presence. In this answer the relator refused to obey the order of the court by answering the questions as directed. This was a refusal in open court and, without more, was sufficient to warrant the proceeding. That he also refused to answer the same questions before the examiners is immaterial, in the view we take of the proceeding. It is, therefore, unnecessary to enter into a discussion as to whether a refusal before the examiners was in legal effect "in open court" within the meaning of the Act of June 16, 1836, P. L. 784, secs. 23–28, or whether the court could punish in this summary manner for a refusal to answer before the examiners. For like reason the argument that a fine only could be imposed for an offense not committed in the presence of the court does not apply, and requires no discussion.

The argument that many of the questions which the relator refused to answer involved no offense against the election laws and were not material to the issue of the contest is rather against the relator than in justification of his refusal to answer. An examination of the questions sent here shows very clearly that this is true of most of them. It is also true that those questions did not necessarily involve self-criminating answers. The situation in this respect is like that in the case of Com. v. Bell, supra, where the contumacious witness "refused to answer any question that could have had even a remote bearing on the material facts. Certainly, fully responsive answers to many of the questions that were put to him . . . . could not have had the slightest tendency to criminate him." On this point the Supreme Court further said: "The relator was not the final arbiter of the question whether his answers to the interrogations propounded would tend to criminate him. It was the plain duty of the trial judge to decide that question." So in the present case, many of the questions do not indicate, even remotely, how answers could tend to criminate the relator, and, under the decision referred to, the refusal to answer them was,

prima facie, a contempt of court, without reference to the constitutional privilege. Whether the question calls for an answer which would tend to criminate the witness was for the judge to decide in the first instance ; and his negative decision must prevail until overcome by satisfactory proof to the contrary. In addition to the protection afforded by the 10th section of article 8 of the constitution, there is in the present case a refusal to answer questions which did not tend to criminate and were, therefore, beyond the pale of the privilege under the bill of rights.

The relator was duly sentenced by the court, which is an appropriate method for a court of criminal jurisdiction to declare its judgment and the punitive consequences.

What we have said sufficiently deals with all the material questions presented by the record of this case.

It follows from what has been said that the relator was not unjustly restrained of his liberty, and, having been released on bail pending the hearing and consideration of this case, without having complied with the sentence of the court below, he must be remanded unto the custody of the respondent, to the end that said sentence be complied with. It is accordingly

Ordered that the relator do forthwith surrender himself into the custody of the sheriff of Lackawanna county, to the end that the sentence of the court of quarter sessions of said county, pronounced against him on December 20, 1898, for contempt of said court, be fully executed, and it is further ordered that he pay the costs of this proceeding.